**No. 22-7114**

---

---

*In the United States Court of Appeals*
*for the District of Columbia Circuit*

MATTHEW COUCH,

APPELLANT

*v.*

VERIZON COMMUNICATIONS, INC.

MICHAEL ISIKOFF,

APPOLLO GLOBAL MANAGEMENT INC.,

NATIONAL PUBLIC RADIO,

RESPONDENTS

---

*ON APPEAL FROM A FINAL ORDER FROM THE UNITED STATES*
*DISTRICT COURT FOR THE DISTRICT OF COLUMBIA*

---

**APPELLANT'S BRIEF**

---

## <u>CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES</u>

(A)  **<u>Parties and Amici</u>**.  Except for Aaron Rich, Deborah Sines, Mark Mueller, and Joseph Capone, all of whom have been voluntarily dismissed from the action, all the parties, amici and intervenors appearing before the District Court and this Court are listed in Appellant's Brief.

(B)  **<u>Rulings Under Review</u>**. The rulings of United States District Court Judge Richard J. Leon at issue in this appeal, dated July 29, 2022 and September 30, 2021, may be found in the parties' Joint Appendix at Ja016 and Ja508, respectively. There is no official citation of the rulings. An unofficial citation of the September 30, 2021 ruling may be found at *Couch v. Verizon Commc'ns, Inc.*, No. 20-2151 (RJL), 2021 WL 4476698, at *1 (D.D.C. Sept. 30, 2021).

(C)  **<u>Related Cases</u>**. There are no related cases currently pending in this court or in any other court of which counsel is aware.

Dated: January 31, 2023

By *Den Quainton*
Eden P. Quainton
QUAINTON LAW PLLC
2 Park Ave., 20th Fl,
New York, NY 10016
Telephone: (212) 419-0575
Fax: (212) 376-5699
E-mail: eden.quainton@quaintonlaw.net
*Attorneys for Plaintiff Matthew Couch*

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT .................................................................1

ISSUES PRESENTED FOR REVIEW .........................................................1

SUMMARY OF THE ARGUMENT .............................................................2

PROCEDURAL HISTORY ...........................................................................3

STATEMENT OF FACTS .............................................................................5

LEGAL ARGUMENT ....................................................................................9

I.    STANDARD OF REVIEW .....................................................................9

II.   JUDGE LEON APPLIED THE WRONG STANDARD TO APPELLANTS'
      PLEADINGS AND MUST BE REVERSED FOR THIS REASON. ...................... 11

III.  COUCH HAS PROPERLY PLED FALSITY ................................................. 13

      A.  Statements Relating to Joe Capone. ...................................16

      B.  The Mark Mueller Allegations. ...........................................20

      C.  Statements about Couch. .......................................................21

IV.   THE FAC RAISES A PLAUSIBLE INFERENCE OF ACTUAL MALICE ON
      THE PART OF ISIKOF. ...................................................................... 23

V.    THE DOCTRINES OF REASONABLE IMPLICATION, FAIR COMMENT,
      ABSENCE OF VERIFIABLE FACT, SUBSTANTIAL TRUTH, AND
      ABSENCE OF DEFAMATORY MEANING DO NOT APPLY. ........................... 34

      A.  Reasonable Implication .........................................................35

      B.  Absence of Verifiable Fact ....................................................35

      C.  Fair Comment.. ......................................................................36

      D.  Substantial Truth. .................................................................38

      E.  Incapable of Defamatory Meaning. ......................................40

VI.   THE DISTRICT COURT WRONGLY DISMISSED COUCH'S REMAINING
      CLAIMS AGAINST ISIKOFF AND VERIZON. ............................................ 41

VII.  YAHOO, VERIZON, AND APOLLO ARE LIABLE FOR ISIKOFF'S
      DEFAMATION OF COUCH. ................................................................ 42

VIII.  NPR IS LIABLE FOR AIDING AND ABETTING DEFAMATION AND CONSPIRACY TO DEFAME. ................................................................................ 44

IX.  NPR IS LIABLE FOR NEGLIGENT SUPERVISION OF DAVE DAVIES. ...... 47

X.  NPR IS LIABLE FOR REPUBLISHING ISSIKOF'S DEFAMATORY STATEMENTS. ................................................................................................... 48

CONCLUSION .......................................................................................................... 52

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Am. Council of Blind v. Mnuchin*,
  977 F.3d 1 (D.C. Cir. 2020) .................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................10

*Bankwest v. Fid. & Deposit Co. of Maryland*,
  63 F.3d 974 (10th Cir. 1995) .............................................................42

*Biddulph v. Callahan*,
  1 F. Supp. 2d 12 (D.D.C. 1998) ........................................................12

*Boarding Sch. Rev., LLC v. Delta Career Educ. Corp.*,
  No. 11 CIV. 8921 DAB, 2013 WL 6670584 (S.D.N.Y. Mar. 29, 2013) ................22

*Brennan v. Kadner*,
  351 Ill. App. 3d 963N.E.2d 951 (2004) .............................................48

*Calloway v. Green Tree Servicing, LLC*,
  607 F. Supp. 2d 669, 672 (D. Del. 2009) .........................................25

*Cianci v. New Times Pub. Co.*,
  639 F.2d 54 (2d Cir. 1980) ...........................................................15, 37

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999) .............................................................24

*Deripaska v. Associated Press*,
  282 F. Supp. 3d 133 (D.D.C. 2017) ..................................................12

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996) ...........................................................9

*Foman v. Davis*,
  371 U.S. 178 (1962) ............................................................................9

*Garrison v. State of La.*,
  379 U.S. 64 (1964) .......................................................................13, 24

*Gill v. Islamic Republic of Iran*,
  249 F. Supp. 3d 88 (D.D.C. 2017) ....................................................46

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ............................................................44

*Harris v. Forklift Sys., Inc.*,
   510 U.S. 17 (1993) ............................................................12

*Haynesworth v. Miller*,
   820 F.2d 1245 (D.C.Cir.1987 ............................................................9

*Hettinga v. United States*,
   677 F.3d 471 (D.C. Cir. 2012) ............................................................10

*Hurlbut v. Gulf Atl. Life Ins. Co.*,
   749 S.W.2d 762 (Tex.1987) ............................................................42

*In re Vitamins Antitrust Class Actions*,
   327 F.3d 1207 (D.C. Cir. 2003) ............................................................12

*Janklow v. Newsweek, Inc.*, 759 F.2d 644 (8th Cir. 1985), *reheard on other grounds*,
   788 F.2d 1300 (8th Cir. 1986), *cert. denied*, 479 U.S. 883 (1986). ..........................32

*Jankovic v. Int'l Crisis Grp.*,
   593 F.3d 22 (D.C. Cir. 2010) ............................................................36

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
   838 F.2d 1287 (D.C. Cir. 1988) ............................................................13, 24, 39

*Lohrenz v. v. Donnelly*,
   350 F. 3d 1272 (D.C. Cir. 2003) ............................................................11, 23, 25

*Malat v. Riddell*,
   383 U.S. 569 (1966) ............................................................12

*Masson v. New Yorker Mag., Inc.*,
   501 U.S. 496 (1991) ............................................................24

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................12

*McBride v. Merrell Dow and Pharmaceuticals, Inc.*,
   717 F.2d 1460 (D.C.Cir.1983) ............................................................32

*McFarlane v. Sheridan Square Press, Inc.*,
   91 F.3d 1501 (D.C. Cir. 1996) ............................................................23

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990) ............................................................23

*New York Times v. Sullivan*,
376 U.S.254 (1964) ........................................................................49

*Nunes v. WP Co. LLC*,
No. 20-CV-01403 (APM), 2020 WL 7668900 (D.D.C. Dec. 24, 2020).................11

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL–CIO v. Austin*,
418 U.S. 264 (1974) ........................................................................13

*Parisi v. Sinclair* ,
845 F. Supp. 2nd 215 (D.D.C. 2012) ....................................................11

*Phelan v. City of Mount Rainier*,
805 A.2d 930 (D.C. 2002) ...............................................................47, 48

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767(1986) ........................................................................13

*Rich v. Butowsky*, et al., 18-cv-0681...................................................21

*Robinson v. Liberty Mut. Ins. Co.*,
958 F.3d 1137 (11th Cir. 2020)...........................................................22

*Safex Found., Inc. v. Safeth, Ltd.*,
531 F. Supp. 3d 285 (D.D.C. 2021) ......................................................16

*Sickle v. Torres Advanced Enter. Sols.*, LLC,
884 F.3d 338 (D.C. Cir. 2018) ............................................................10

*Sirer v. Aksoy*,
No. 21-CV-22280, 2022 WL 10046427 (S.D. Fla. Oct. 17, 2022)........................33

*Singletary v. Howard Univ.*,
939 F.3d 2875 (D.C. Cir. 2019) ............................................................9

*Southern Air Transport, Inc. v. American Broadcasting Companies, Inc.*, 877 F.2d
1010 (D.C.Cir.1989)........................................................................32

*St. Amant v. Thompson*,
390 U.S. 727 (1968) .......................................................................23, 28

*Stanton v. Metro Corp.*,
438 F.3d 119 (1st Cir. 2006)...............................................................30

*Tah v. Glob. Witness Publ'g, Inc.*,
413 F. Supp. 3d 1D.D.C. 2019), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021)...................30

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987)) ................................................24

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) ................................................11

*United States v. Alston-Graves*,
  435 F.3d 331 (D.C. Cir. 2006) ................................................46

*Washington Reg'l Medicorp v. Burwell*,
  813 F.3d 357 (D.C. Cir. 2015) ................................................12

*Washington Times Co. v. Bonner*,
  86 F.2d 836 (D.C.Cir.1936) ................................................36

*Waskow v. Associated Press*,
  462 F.2d 1173 (D.C. Cir. 1972) ................................................49

*White v. Fraternal Ord. of Police*,
  909 F.2d 512 (D.C. Cir. 1990) ................................................32

*Whitt v. Am. Prop. Constr., P.C.*,
  157 A.3d 196 (D.C. 2017) ................................................41, 42

*Wilcox v. Georgetown Univ.*,
  No. CV 18-422 (RMC), 2019 WL 132281 (D.D.C. Jan. 8, 2019) ..............22

*Xcentric Ventures, LLC v. Stanley*,
  No. CV-07-00954-PHX-NVW, 2007 WL 2177216 (D. Ariz. July 27, 2007).........33

## Statutes

28 U.S.C. § 1332 ................................................1

28 U.S.C. § 1291 ................................................1

## Other Authorities

Ann C. McGinley, *Misogyny and Murder*, 45 Harv. J. L. & Gender 177 (2022).......33

Jason J. Sullivan-Halpern, *The Globalization of Hate: Are Domestic Terrorism Laws Sufficient to Quell New Threats from Alt-Right Lone-Wolf Extremists?*, 9 Penn St. J.L. & Int'l Aff. 133 (2020) ................................................33

P. Keeton, *Defamation and Freedom of the Press*, 54 Tex.L.Rev. 1221 (1976) ........37

Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 2.4.2 (2004) ................................................30

https://www.splcenter.org/fighting-hate/extremist-files/ideology/alt-right ...............22

## **Rules**

Circuit Rule 30 of District of Columbia Circuit ...........................................4

Fed. R. App. Pro. 30(a)(2) ................................................................4

Fed. R. Civ. Pro. 12(b)(5) ..............................................................3,4

Fed. R. Civ. Pro. 12(b)(6) ...........................................................3, 4, 9, 10

## **Treatises**

Restatement (Second) of Torts § 581A, comment f (1977) .......................................38

Restatement (Second) of Torts § 623A) ....................................................42

## JURISDICTIONAL STATEMENT

On July 29, 2022, the District Court issued a final order (the "Final Order") denying Appellant leave to file an amended complaint on the grounds of futility and dismissing with prejudice the action for defamation filed under Docket Number 20-cv-2151 by Appellant Matthew Couch ("Appellant" or "Couch"). The Final Order also granted a Motion for Judgment on the Pleadings filed by NPR. This appeal from all aspects of the Final Order was timely filed on August 4, 2022.

The District Court's subject matter jurisdiction was invoked under 28 U.S.C. § 1332 because there is diversity of citizenship among the parties, and the amount in controversy exceeds $75,000 exclusive of interest and costs. The District Court had personal jurisdiction over the matter because certain parties were located or headquartered in Washington D.C., and the allegedly defamatory statements concerned parties, events and conduct in Washington D.C.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

(1)  Whether the District Court erred in denying Appellant leave to file an amended complaint and conduct discovery into the corporate parties liable for the defamation alleged by Appellant.

(2)  Whether the District Court erred in granting the Motion for Judgment on the Pleadings of Defendant National Public Radio ("NPR")

(3)   Whether the District Court erred in dismissing the action with prejudice.

## SUMMARY OF THE ARGUMENT

This case is before the Court on appeal from a Final Order denying Appellant leave to file an amended complaint for defamation against journalist Michael Isikoff ("Isikoff"), Yahoo! Inc.("Yahoo"), the publisher of the alleged defamatory material, Verizon Communications Inc., ("Verizon"), the former sole owner of Yahoo, and NPR, the alleged aider and abettor of Isikoff and re-publisher of the allegedly defamatory material. The Final Order also granted a Motion for Judgment on the Pleadings brought by NPR and dismissed the action with prejudice. Because the Court's review is *de novo*, as discussed below, this case can be resolved by determined whether Appellant's proposed First Amended Complaint (the "FAC") states a claim on which relief can be granted.

 Appellant maintains that he has been defamed by a smear campaign that, in reckless disregard of the truth, attributes to him statements he did not make and conduct in which he did not engage arising in connection with the tragic murder of Seth Rich, a young DNC staffer who was killed on the night of June 10, 2016. Appellant maintains that because he has been a prominent independent investigator into the Seth Rich murder, he has been the victim of vicious attacks, predicated on the false notion that he propounded the baseless conspiracy theory that Hillary Clinton and her allies assassinated Seth Rich. Mainstream journalists and commentators,

2

including Isikoff, have sought to develop a narrative that in the "post-truth" era, the activity of alternative sources of news and opinion pose a unique challenge to modern democracy. As part of this narrative, at least as told by Isikoff, Couch is made into the poster child, the villainous face of the threat to democracy created by online misinformation. Yet the extreme statements and actions attributed to Couch were not based in reality but were conjured up, in reckless disregard of the truth, in service of a narrative desire to "tag" someone with responsibility for harmful speech and conduct. Ultimately, Couch was used for the very thing of which he was accused: to drive clicks and profit in reckless disregard of the truth of the statements. This appeal aims to bring to account those who would abuse their journalistic power in service of a narrative divorced from facts.

## PROCEDURAL HISTORY

This case began with the filing of a complaint by Appellant on August 6th 2020 against Verizon, Isikoff, NPR, and various other defendants who have since been dismissed from the action. Ja30.

After some initial skirmishing with Couch, Respondent NPR filed a motion under Fed. R. Civ. Pro.12(b)(5), while Respondents Verizon and Isikoff filed motions to dismiss under Fed. R. Civ. Pro.12(b)(5) and Fed. R. Civ. Pro. 12(b)(6). ECF Dkts.

28, 45, 46.[1] Judge Richard J. Leon ("Judge Leon" or the "District Court") denied NPR's motion with a minute order dated September 30, 2021. Judge Leon then denied the Verizon/Isikoff motion to dismiss under Fed. R. Civ. Pro. 12(b)(5) but granted their motion under Fed. R. Civ. Pro. 12(b)(6) with a Memorandum Opinion, Ja 508 (the "First Opinion"), and Order, Ja522 (the "First Order").

NPR then answered the complaint, Ja523, and filed a Motion for Judgment on the Pleadings. ECF Dkt. 64. Couch opposed the motion for judgment on the pleadings, ECF Dkt. 69, and cross moved for leave to file an amended complaint and conduct initial discovery, ECF Dkt. 70. Couch attached his proposed first amended complaint (the "FAC") as an exhibit to a declaration submitted concurrently with the cross motion. Ja608-Ja670. The Court granted NPR's motion and denied Couch's cross-motion on the grounds of futility in a new Memorandum Opinion, Ja16 (the "Second Opinion"), and Final Order, Ja29. Judge Leon also denied Couch's request to take initial discovery in connection with the corporate restructuring discussed *infra* at 8. Ja028.[2]

Couch believes that Judge Leon erred in both the First Opinion and Order and the Second Opinion and Final Order, but because the proposed FAC was designed to

---

[1] Fed. R. App. Pro. 30(a)(2) allows the court or the parties to refer to parts of the record in the District Court even though not in the appendix. Circuit Rule 30 of the District of Columbia Circuit does not modify the Federal Rules.

[2] The Final Order, Ja029, does not reference Appellant's request for discovery, but this appears to be an oversight.

remedy any pleading deficiencies identified by Judge Leon or Respondents and was still rejected by as legally insufficient, the central issue on appeal is whether the District Court erred in denying Couch leave to file the proposed FAC.

This Court's review both of the denial of leave to amend and the granting of the motion for judgement on the pleadings is *de novo*, as described *infra* in Standard of Review. This appeal can therefore be resolved by judging whether the FAC properly states a claim on which relief can be granted.

## STATEMENT OF FACTS

On August 6th, 2019, Respondent Michael Isikoff, the chief investigative reporter for Yahoo! News, a division of Yahoo! wholly owned and controlled by Respondent Verizon, published the sixth episode of a six-part podcast entitled "*Conspiracyland*." Ja93, Ja609. The goal of Conspiracyand was to provide "a window into how . . . crazy theories are spawned and manipulated in the swirl of social media, sometimes for cash, sometimes for publicity." Ja623.

Specifically, *Conspiracyland* aimed to examine the theories that sprung up around the tragic killing of DNC staffer Seth Rich in the early morning hours of July 10th, 2016, and, in particular, the theory that Hillary Clinton had ordered the assassination of Seth Rich. Ja623-24. This theory is introduced early in the podcast through two unidentified male voices, who are heard saying, "So what really happened to Seth Rich? Well, we know Hillary likes to kill people. You know, she's

got a long history of having her henchmen do it" and "Ladies and gentlemen, Seth Rich was assassinated for political reasons." Ja624. Nothing links Couch in any way with these statements and Isikoff never claims they come from Couch.[3]

According to Isikoff, the Hillary Clinton assassination theory originated with a bulletin put out by the Russian SVR, the purported "Russian version of the CIA." Ja625-26, Ja628-29. In Isikoff's telling, a US "mouthpiece for Kremlin propaganda," the obscure website whatdoesitmean.com immediately picked up the Russian story and featured it on the site. Ja629. Russia was thus "fanning the flames" of its ongoing election interference campaign. Ja625.

However, the day after the first episode of *Conspiracyland* was published, the Washington Post debunked the theory that Russian military intelligence was at the origin of the Hillary Clinton assassination theory, writing simply, "it's not true." Ja764.

*Conspiraclyand* makes an additional leap, central to the present appeal: Isikoff uses Joe Capone, the manager of Lou's Bar and Grill, the last location where witnesses saw Seth alive before the shooting, as a foil for Isikoff's further theory that *Couch* is also responsible for spreading the Hillary Clinton assassination theory. Ja636-37. Isikoff's allegedly false statements attempting to cast Couch as one of the

---

[3] If the case is permitted to proceed, Couch will establish that these are the voices of Alex Jones and Roger Stone.

promoters of a conspiracy theory that originated with Russian military intelligence are central to Appellant's defamation claims.

The second main theme in the *Conspiracyland* Podcast is that conspiracy theories such as the Hillary Clinton assassination theory "pollute" political discourse and damage innocent third parties, thus threatening and undermining democracy. Ja623, 646, 658. As with his supposed role in spreading the Hillary Clinton assassination theory, *Conspiracyland* seeks to make Couch the face of this threat. Ja640-41. Aside from Aaron Rich, whom Couch voluntarily dismissed from the action, Ja83, the two third parties through whom Isikoff makes his attacks are Joe Capone, discussed above, and Mark Mueller, a neighbor of Seth Rich who identified Rich for the police after the shooting. Ja638. Couch's alleged statements and conduct in connection with this second main theme are also at the heart of Appellant's defamation claims.

Following the release of the final episode of *Conspiracyland*, on August 8, 2016, Isikoff appeared on NPR and repeated many of the podcast's allegations, even though the Washington Post had debunked its core theory that Russian intelligence was at the origin of the Hillary Clinton assassination theory. Ja645. Isikoff presented his corollary theory that Couch was guilty of disseminating the Russian-based Hillary Clinton assassination theory as established fact. Ja647-48.

Isikoff also reiterated his assertions that Couch was responsible for harmful statements about third parties. Ja648.

Separately from the contents of the allegedly defamatory statements made by Isikoff and republished by NPR, Verizon entered into a transaction with a multibillion-dollar hedge fund, Apollo Global Management, Inc. ("Apollo") that modifies the potential liability for the harms alleged in the FAC. Ja611-613. On May 2, 2021, Verizon entered into a definitive agreement with an affiliate of Apollo (the "Apollo Affiliate") pursuant to which Verizon agreed to sell Verizon Media, Inc. ("Verizon Media"), formerly known as Oath, Inc., the company formed to hold Verizon's acquisitions of AOL and Yahoo, Inc., in return for consideration of $4.3 billion in cash, subject to customary adjustments, $750 million in non-convertible preferred limited partnership units of the Apollo Affiliate, and 10% of the fully-diluted common limited partnership units of the Apollo Affiliate. Ja611-12. The Apollo Affiliate is operating Yahoo, Inc. as a standalone company known simply as "Yahoo." Ja612. As a holder of limited partnership units in the partnership that controls Yahoo, Verizon is believed to retain the power to influence the operations of Yahoo. *Id.* The precise allocation of responsibility for contingent liabilities is currently unknown. As discussed above, Judge Leon denied Appellant's motion for discovery into this issue. *See supra* at 4.

## LEGAL ARGUMENT

### I.    STANDARD OF REVIEW

A motion for judgment on the pleadings is reviewed *de novo* by this Court. *Statewide Bonding, Inc. v. United States Dep't of Homeland Sec.*, 980 F.3d 109, 114 (D.C. Cir. 2020). The Court should review the decision as if it were a motion for failure to state a claim under Fed. R. Civ. Pro. 12(b)(6). *Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C. Cir. 2002) (in reviewing a motion for judgment of the pleadings a Court should "accept as true the allegations in the opponent's pleadings" and "accord the benefit of all reasonable inferences to the non-moving party") (citing *Haynesworth v. Miller,* 820 F.2d 1245, 1249 n. 11 (D.C.Cir.1987)).

A grant or denial of leave to amend is generally committed to a district court's discretion, *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). It is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as "undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by [previous] amendments ... [or] futility of amendment." Id. (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962).

However, when leave to amend is denied based on a legal interpretation, such as futility, the Court conducts a *de novo* review. *Singletary v. Howard Univ.*, 939 F.3d 287, 295 (D.C. Cir. 2019). *See also Scahill v. D.C.*, 909 F.3d 1177, 1181 (D.C. Cir. 2018) (*de novo* review of the denial of leave to amend the complaint based "on

grounds of futility where the proposed pleading would not survive a motion to dismiss"). Because the Court's review is of both Judge Leon's decisions on the Motion for Judgment of the Pleadings and the Cross-Motion for Leave to Amend is *de novo*, the issue before the Court is whether the FAC would survive a motion to dismiss under Fed. R. Civ. Pro. 12(b)(6).

A motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) tests the legal sufficiency of a complaint. *Sickle v. Torres Advanced Enter. Sols.*, LLC, 884 F.3d 338, 344 (D.C. Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Id.* at 344–45 (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When evaluating a motion under Fed. R. Civ. Pro.12(b)(6), the court must "accept the plaintiff's factual allegations as true," *Sickle*, 884 F.3d at 345, and "construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).

In determining whether a complaint fails to state a claim under Fed. R. Civ. Pro. 12(b)(6), a court may consider the facts alleged in the complaint, documents either

attached to or incorporated in the complaint, and matters of which the court may take judicial notice. *See Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006). With respect to documents outside the pleadings, "[a] district court may consider documents attached to a motion to dismiss, without converting the motion into a motion for summary judgment, if those documents' authenticity is not disputed, they were referenced in the complaint, and they are 'integral' to one or more of the plaintiff's claims." *Nunes v. WP Co. LLC*, No. 20-CV-01403 (APM), 2020 WL 7668900, at *3 (D.D.C. Dec. 24, 2020).

## II.    JUDGE LEON APPLIED THE WRONG STANDARD TO APPELLANTS' PLEADINGS AND MUST BE REVERSED FOR THIS REASON.

As an initial matter, in the First Opinion, which he incorporates into the Second Opinion, Judge Leon states:

> *To plead* actual malice so as *to survive a motion to dismiss, the plaintiff must show, by clear and convincing evidence*, that when the defendants published the allegedly defamatory statement, they were subjectively aware that it was highly probable the story was, "(1) fabricated; (2) so inherently improbable that only a reckless person would have put it in circulation; (3) based wholly on an anonymous telephone call or some other source the defendant has obvious reasons to doubt.

Ja514-15, citing *Parisi v. Sinclair* , 845 F. Supp. 2nd 215, 218 (D.D.C. 2012) (quoting *Lohrenz v. v. Donnelly*, 350 F. 3d 1272, 1283 (D.C. Cir. 2003)(emphasis added).

This is an incorrect standard. It is a *summary judgment standard*, not one appropriate for a motion to dismiss. It is simply wrong to state that "to survive a motion to dismiss," the plaintiff must "show" anything, by "clear and convincing evidence," or otherwise. As discussed above, under *Iqbal* and *Twombly*, the Plaintiff

must allege facts that raise a "reasonable" or "plausible" inference that the Defendants are guilty of the conduct complained of. But a motion to dismiss does ***not*** require an evidentiary showing. A proper statement of the law is that "where a public figure pursues a libel action, the public figure must *ultimately* "demonstrate by clear and convincing evidence that the defendant published the defamatory falsehood with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 143 (D.D.C. 2017) (citations omitted).

By reformulating an ultimate showing as a threshold pleading requirement, Judge Leon placed an impossibly high burden on Appellant, and the District Court must be reversed. Although a court applying *de novo* review may affirm a lower court for reasons other than those stated in the lower court's opinion, *Washington Reg'l Medicorp v. Burwell*, 813 F.3d 357, 361 (D.C. Cir. 2015), when a decision under review applies the wrong standard, the better course is for the reviewing court to formulate the correct standard, reverse and remand. *See Malat v. Riddell*, 383 U.S. 569, 572 (1966); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 583-88(1986); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Biddulph v. Callahan*, 1 F. Supp. 2d 12, 24 (D.D.C. 1998); *In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1209 (D.C. Cir. 2003); *Am. Council of Blind v. Mnuchin*, 977 F.3d 1, 5 (D.C. Cir. 2020)

## III.    <u>COUCH HAS PROPERLY PLED FALSITY</u>.

A defamation plaintiff must ultimately show, by a fair preponderance of the evidence, that the allegedly defamatory statements are false. *See Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988); *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775–78,(1986); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL–CIO v. Austin,* 418 U.S. 264, 284 (1974) ("Before the test of recklessness or knowing falsity can be met, there must be a false statement of fact."); *Garrison,* 379 U.S. at 74 ("[A] public official [is] allowed the civil [defamation] remedy only if he establishes that the utterance was false."). A proper pleading of falsity must thus allege sufficient factual material that, if true, would meet this standard. Judge Leon dismissed Couch's claims as "conclusory," Ja516-017, but this is too facile.

Couch's defamation claims fall into two broad categories: (1) claims that he was falsely alleged to have said or done something he did not do and (2) claims that he is not the type of person Defendants claim he is. The first category of claims encompasses the most damaging allegations against Couch and will be the focus of this appeal. Couch is alleged to have said or done the following:

> (a) Asserted that Joe Capone met with Hillary Clinton or aides to Hillary Clinton in the days before Seth Rich's murder;
>
> (b) Asserted that Joe Capone "conspired" with Hillary Clinton or aides to Hillary Clinton;
>
> (c) Implied that Couch advanced the conspiracy theory that Hillary

13

Clinton murdered Seth Rich;

(d) "Doxed" Mark Mueller by publishing the addresses and phone numbers of his siblings and neighbors;

(e) Superimposed Mr. Mueller's head on pictures of serial killer Jeffrey Dahmer and Dexter;

(f) Sought to rent out Mr. Mueller's basement room to gain access to documents relating to Seth Rich;

(g) Harassed Mueller by relentless phone calls and emails; and

(h) Asserted that Mueller and Capone were complicit in a "coverup."

Ja650

The falsity of each of these claims resides in the fact that Couch *did not say or do* the things alleged. Appellant must thus ultimately prove a negative, a difficult but not impossible task. To do this, Appellant can only combine his own denials of the statements or actions with direct and circumstantial evidence to corroborate the denial. But Couch is not alleged to be sitting on a bar stool "saying" things or expounding on theories to random passers-by. Rather, Couch's statements are alleged to be part of the "swirl of social media." Ja623 ¶ 46. Couch is alleged to be an "Internet" conspiracy entrepreneur, an "Internet" crankster. Ja609, 650. The specific allegations against Couch relate to social media activity. Ja647. In other words, there is an extensive documentary data base to draw upon in assessing truth or falsity.

Thus, Couch's proof will ultimately consist of his own sworn denials and the non-existence of any social media posts that support the accusations against him. At the pleading stage, it would be impossible – and undesirable – for Couch to submit tens or even hundreds of thousands of pages of tweets, posts, and "likes," requiring

14

the District Court to read through the mass of documents to confirm that, indeed, nothing supports the charges against him. Appellant can only raise a plausible inference that the social media record will confirm his denial. This Couch does by alleging that Isikoff, the chief investigative reporter at Yahoo! News boasts of having reviewed thousands of posts relating to Seth Rich but produces ***nothing*** to support the defamatory allegations of which Couch complains. Ja641. When Isikoff does have support for his allegations, he provides them, as he does with claims, now removed from Couch's pleadings, relating to Aaron Rich, where Isikoff plays for the audience a recording of Couch's own comments. Ja108-09. The absence of any similar support for any of the allegations complained of in the FAC is persuasive circumstantial factual support that no such support exists. Ja641-42. This circumstantial evidence is reinforced by Isikoff's own efforts to dismiss Couch's claims in submitting a selection of "tweets" from Appellant. Ja478-Ja507. ***None*** of these documents actually substantiates ***any*** of the allegations made against Couch. As Couch states, "if he [Isikoff] had any knowledge of any supporting post, tweet or image, he would obviously offer the evidence." Ja641. When nothing is offered, it is a fair inference that nothing exists.[4]

---

[4] When this issue comes up in the defamation context, discovery is generally warranted. *See Cianci v. New Times Pub. Co.*, 639 F.2d 54, 58–59 (2d Cir. 1980) (plaintiff answered interrogatories and submitted to a deposition before establishing falsity of statement). *Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285, 309

Applied to the specific allegedly defamatory statements at issue in this appeal, the foregoing principles clearly show that, contrary to Judge Leon's holding that Couch's allegations were "conclusory," Couch has met his burden at the pleading stage of establishing falsity.

A. <u>Statements Relating to Joe Capone.</u>

1.    <u>Secret meetings with Hillary Clinton or aides to Hillary Clinton.</u>
According to Joe Capone, Couch posted allegations on the Internet claiming that Joe Capone had gone to the White House to have secret meetings with Hillary (Clinton) or aides to Hillary Clinton. Ja636. Couch denies any such statement was ever made. Ja650. Isikoff repeats Capone's assertion uncritically even though nothing in any of the Internet posts submitted by Isikoff provide any support for the assertion that Couch claimed Capone met with Hillary or her aides at the White House. Ja482-Ja507. No evidence is offered anywhere else in the *Conspiracyland* podcast to support this claim. A reasonable inference of falsity arises.

2.    <u>Allegations that Joe Capone conspired with Hillary Clinton or aides to Hillary Clinton.</u>
In his exchange with Joe Capone, Isikoff supplies language for Capone to approve, allegedly said by Couch, that Capone was "conspiring with Hillary Clinton"

───────────────

(D.D.C. 2021) (defendant "peppered" the court with evidence in support of truth of allegedly defamatory assertions).

or "aides to Hillary Clinton." Ja636. Couch also denies that he made any such statement. Ja650. Nothing in any of the Internet posts submitted by Isikoff provide any support for the assertion that Couch claimed Capone met with Hillary or her aides at the White House. Ja482-Ja507. No evidence is offered anywhere else in the *Conspiracyland* podcast to support this claim. Isikoff has in fact fabricated out of whole cloth the claim that Matt Couch "was saying. . . [Joe Capone] was conspiring with Hillary Clinton." Ja 636. A reasonable inference of falsity arises.

Isikoff not only makes the false claim that Couch stated that Joe Capone was conspiring with Hillary Clinton during the *Conspiracyland* podcast. Isikoff goes one step further and, in the course of his NPR interview, actually quotes his own fabrication as fact without any reference to an alleged statement of Capone:

> Matt Couch and the Internet horde discover this [that Capone had visited the White house] apparently from White House visitor logs. And they say, a-ha, you see, why is Joe Capone going to the White House just a few days before Seth Rich's death? He must have been consulting with somebody, aides to Hillary Clinton, and this somehow had something to do with Seth Rich's death. Ja647.[5]

---

[5] This is a crucial point for Couch's appeal. As will be discussed in more detail below, an initial statement of the alleged Couch quotation was received with reservation by Capone, who commented that Isikoff's quotation "must have been" what Couch said, implying that Capone cannot vouch for the statement even though he is presented as Isikoff's only source for it. *See infra* at 26, 36-37, 51. Thus Isikoff knows he has no factual basis to claim this statement is anything other than a fabrication. Yet when Isikoff repeats the alleged quotation during the NPR interview, the "must have been" is no longer a reservation of Capone, but a literal expression of what Couch is alleged to have said. *Id.*

3.    The implication that Couch advanced the conspiracy theory that Hillary Clinton murdered Seth Rich.

By falsely associating Couch's statements about Joe Capone with allegations about meetings and conspiracies with Hillary Clinton, through suggestion, fabrication and uncritical repetition, Isikoff is advancing the central narrative of the *Conspiracyland* podcast: that bad actors on social media generally – and Matt Couch specifically – were advancing the conspiracy theory that Hillary Clinton murdered Seth Rich. By making Capone agree that Couch asserted he was "conspiring with Hillary Clinton" Isikoff's obvious purpose is to cast Couch as promotimng the Russia-originated idea that Hillary Clinton was involved in nefarious "conspiring" to murder Seth Rich on the eve of his death. But nothing in *Conspiracyland* even remotely supports this implication. Isikoff claims to have reviewed "thousands" of Russia-related Seth Rich posts and not a single one references Couch in any way. Ja641. The only link between Couch and the Hillary Clinton assassination theory is the quote Isikoff provides, fabricates even, for Joe Capone.

4.    The allegation that Couch accuses Joe Capone and Mark Mueller of involvement in a cover-up.

Isikoff unmistakably alleges that Couch accused Joe Capone Mark Mueller (a witness discussed in more detail below) of participation in a cover-up. Ja116 ("He [Couch] made no reference to those like Mueller and Capone, who he had also claimed were part of a supposed Seth Rich cover-up"). Couch denies having made

18

such an accusation and Isikoff introduces this accusation just after playing an audio of Matt Couch making unrelated comments, dishonestly attempting to make the attack on Couch seem plausible because the listener has just heard Couch's voice, but without providing any evidence to support the accusation. *Id.*[6] Couch denies having made the statement and Isikoff offers nothing in the entire podcast in support of the accusation. Ja641. The tweets produced by Isikoff contain one statement that cannot fairly be construed against Capone and says nothing about Mueller:

> Why did so many people in and around the Seth Rich murder visit the White House. Joe Capone on July 6, Muriel Bowser on July 8, Liz Lyons on July 12. So much corruption and coverup America. Help us find the truth. #SethRich #AmericaFirstMedia.

Ja497.[7]

Even taken in the light most favorable to Isikoff, this tweet does not state or even suggest that *Capone* was part of a cover-up, but that *someone else* was covering up *something*. Such a vague sentence cannot plausibly support a declarative targeting Capone. Moreover, it does not even remotely suggest that that Mark Mueller, who is not even mentioned, was involved in a cover-up. A reasonable inference of falsity as to Capone arise and, as to Mueller, a firm conviction that Isikoff has simply made up the allegation to fit his narrative.

---

[6] This technique of defamation by juxtaposition is discussed in more detail below. *See infra* at 29-32.

[7] This is the only textual evidence referenced anywhere in *Conspiracyland* or in any of the materials submitted by Defendants that even remotely relates to any of the allegedly defamatory statements.

B. <u>The Mark Mueller Allegations.</u>

Mark Mueller makes a series of claims about Internet trolls, "like Matt Couch." Ja116, Ja639. According to Mueller's un-named ex-girlfriend, who is the only source cited for these accusations and who sent Mueller screenshots from Twitter and Facebook, these "trolls" superimposed images of Mark Mueller's face on pictures of the mass murderer, Jeffrey Dahmer and published the phone numbers of all Mark Muellers' brothers and sisters and neighbors. Ja115, Ja638. Mark Mueller claims he was then contacted at home and at the office and that he had to turn people away from an Airbnb he operated out of fear the "trolls" would illegally attempt to break into his house. Ja115-16, Ja638-39. While Mueller states that it was people "like Matt Couch" who were responsible for this harassing conduct, Isikoff leaves no doubt that he is specifically fingering Couch as the author of this harmful conduct. As soon as Mueller mentions Couch, Isikoff cuts away and focuses attention on Couch, leaving no doubt in the listener's mind that Couch is the person behind the harassing attacks on Mark Mueller. Ja639-40.[8]

Couch denies each and every one of these allegations. Ja650. Isikoff is told by Mark Mueller that there are Facebook and Twitter posts provided by Mueller's ex-girlfriend that would corroborate the allegations, but Isikoff does not suggest he ever reviewed these posts, and he provides no evidence in support of the allegations.

---

[8] This technique is discussed in more detail below. *See infra* at 29-32.

Rather, Isikoff switches topic and focuses on an unrelated incident, in which Couch apologizes for certain statements he had made unrelated to Mark Mueller, apparently in an effort to provide evidence for the casting of Couch as the villain in the Mark Mueller drama. Ja639-40, Ja116.[9] But where an investigative journalist does provide evidence relating to one allegation, his failure to offer any evidence whatsoever with respect to other allegations that are vehemently denied by the allegations' target, clearly gives rise to a fair inference of falsity.

    C. <u>Statements about Couch.</u>

    The FAC also alleges that Couch was defamed by Isikoff's false characterizations of him. Two of these, in particular, are demonstrably false. Couch is variously smeared as an "Internet troll," Ja632, Ja109 and a member of the alt-right, Ja639, Ja650.[10] For each of these labels, the allegations in the FAC gives rise to a plain inference of falsity. According to the FAC, Couch is an independent investigator and journalist and publisher of a conservative blog, the DC Patriot. Ja632-33. An "Internet troll" is a "member of an online social community who deliberately tries to

---

[9] The unrelated incident was the subject of a separate lawsuit, *Rich v. Butowsky*, et al., 18-cv-0681.Whatever one thinks of this portion of the *Conspiracyland* podcast, for purposes of Capone and Mueller, Isikoff is employing a rhetorical device designed to sway the listener emotionally into believing it is *possible* Couch would have said or done the things alleged, when in fact no actual evidence supports the allegations.

[10] Couch does not concede the non-defamatory nature of epithets such as Internet conspiracy entrepreneur, Internet "crankster" and Southern "confederate," but in the interest of space will only focus on the two most jarring false characterizations.

disrupt, attack, offend or generally cause trouble within the community." Ja632. The

Mueller report also provides a slightly different, but still objective, definition of an

Internet troll: a paid operative who posts inflammatory or otherwise disruptive content

on social media or other websites. *Id.*; Ja175. Without any evidence to support the

epithet, the inference at the pleading stage is one of falsity. With respect to Couch

being "alt-right," *Conspiracyland* also provides no evidence whatsoever. Accordingly

to the Southern Poverty Law Center, the "Alternative Right, commonly known as the

"alt-right," is a set of far-right ideologies, groups and individuals whose core belief is

that "white identity" is under attack by multicultural forces using "political

correctness" and "social justice" to undermine white people and "their" civilization."

https://www.splcenter.org/fighting-hate/extremist-files/ideology/alt-right.[11]

Associating Couch with this "set of far-right ideologies" is patently false. The FAC

identifies Couch as the editor of the DC Patriot, Ja609, whose content is a matter of

public record. https://thedcpatriot.com/.[12] Nothing in the tweets submitted by Isikoff

lend any support to a racialized, white nationalist slant to Couch's writings. Ja478-

JaA507. Nothing in Couch's other statements referenced in *Conspiracyland*, such as

---

[11] The Court can take judicial notice of this definition. *Wilcox v. Georgetown Univ.*, No. CV 18-422 (RMC), 2019 WL 132281, at *4 (D.D.C. Jan. 8, 2019); *Robinson v. Liberty Mut. Ins. Co.*, 958 F.3d 1137, 1142 (11th Cir. 2020).

[12] It is generally proper to take judicial notice of Web sites published on the Internet. *Boarding Sch. Rev., LLC v. Delta Career Educ. Corp.*, No. 11 CIV 8921 DAB, 2013 WL 6670584, at *1 (S.D.N.Y. Mar. 29, 2013)

Couch's apology, have anything whatsoever to do with the "alt-right." Ja675. The falsity of this attack is palpable.

## IV.   THE FAC RAISES A PLAUSIBLE INFERENCE OF ACTUAL MALICE ON THE PART OF ISIKOF.

Beyond its imposition of an impossible burden on Appellant by the use of an erroneous standard of review, and its incorrect statement that Couch's claims were "conclusory," as has just been shown, Judge Leon erred in holding that the FAC "lacks allegations sufficient to show that Isikoff, much less any of the other defendants, acted with actual malice in making any of the statements Couch identifies as defamatory." Ja207. As a preliminary note, Judge Leon's insistence on Couch's failure to "show" at the pleading stage indicates he has not abandoned the erroneous summary judgment standard to which he is holding Couch, and for this reason alone his decision must be reversed. *See supra* at 11-12. But Judge Leon also misapplied the law of actual malice.

Under well-established law, a plaintiff must allege facts that, if established, would 'permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1512 (D.C. Cir. 1996) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). The allegations in a pleading must permit the inference that the defendants was "subjectively aware that it was highly probable that the story was '(1) fabricated;

(2) so inherently improbably that only a reckless person would have put [it] in circulation; or (3) based wholly on . . . some other source that appellees had obvious reasons to doubt.'" *Lohrenz*, 350 F.3d at 1283 (quoting *Tavoularas v. Piro*, 817 F.2d 762, 788-98 (D.C. Cir. 1987)). *See also Tah v. Glob. Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 12 (D.D.C. 2019), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021). At trial, "through the defendant's own actions or statements, the dubious nature of his sources, the inherent improbability of the story or other circumstantial evidence, the plaintiff must demonstrate that the defendant himself entertained a "high degree of awareness of ... probable falsity." *Liberty Lobby,* 838 F.2d at 1293 (D.C. Cir. 1988) (quoting *Garrison v. State of La.*, 379 U.S. 64, 74 (1964).

Some of Isikoff's tactics stand out for particularly harsh criticism. "The use of 'calculated falsehood,' falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Garison* 379 U.S. at 75. A fabricated quotation "may injure reputation . . . giving rise to a conceivable claim of defamation because it attributes an untrue factual assertion to the speaker." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 511 (1991). Maintaining a story unchanged in the face of its definitive debunking provides further circumstantial evidence of reckless disregard. *See, e.g., Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 736 (9th Cir. 1999)

(showing of actual malice where defendant failed to correct statement when confronted with conflicting evidence); *Calloway v. Green Tree Servicing, LLC*, <u>607 F. Supp. 2d 669, 672</u>, <u>676</u> (D. Del. 2009) (allegation of failure to correct erroneous credit information states actual malice claim).

Applying these principles to the allegations in the FAC, it is clear that Appellant has raised a plausible inference of reckless disregard of the truth, even calculated falsehood, on the part of Isikoff. First, with respect to the Hillary Clinton statements he elicits from Capone with leading questions, Isikoff is in possession of Couch's relevant tweets, which he has offered to trial court. Ja478-Ja507. These tweets make no mention of Hillary Clinton and do not even plausibly suggest any Hillary Clinton connection. Moreover, any connection between Capone's visit to the White House and Hillary Clinton is "inherently improbable." *Lohrenz*, <u>350 F.3d at 1283</u> The notion that a candidate for the presidency or her aides would even be in the White House in the heat of a presidential campaign is patently absurd and implies conscious disregard by Hillary Clinton and her campaign – and of Barack Obama and his team – of basic campaign finance laws. Hillary Clinton's campaign was subject to intense scrutiny by the press and the notion that she would have been lurking in the White House with her aides, ready to conspire with a visitor to plot a murder, is a claim so fantastic, so completely divorced from reality that any reasonable person, let

alone a supposed investigative journalist, would have obvious reasons to doubt the truth of such a statement, which, as has been shown above, was patently false.

But Isikoff does not simply republish wildly improbable claims he has every reason to doubt given his knowledge of Couch's actual tweets. The even more serious allegation is that Isikoff has fabricated a quotation from Couch and attempted to elicit the confirmation of Capone. Issikof asserts that Couch was "saying" that Capone was "conspiring with Hillary Clinton or. . ." Ja636 "aides to Hillary Clinton. Ja637.  This alleged quotation is not intended as a gloss on what Couch might have been implying had he made any mention of Hillary Clinton, which he doesn't. Isikoff leaves no doubt when he is interviewed on NPR that he is accusing Couch of ***actually saying*** that the Hillary Clinton team was nefariously conspiring with Capone in the days before the murder of Seth Rich—unmistakably linking Couch to Isikoff's hobbyhorse, the Hillary Clinton assassination theory:

> *Matt Couch and the Internet horde* discover this apparently from White House visitor logs. And they *say, a-ha, you see,* why is Joe Capone going to the White House just a few days before Seth Rich's death? *He [Capone] must have been consulting with somebody, aides to Hillary Clinton,* and this somehow had something to do with Seth Rich's death.

Ja647 (emphasis added).

When Capone reacts to the fabricated quotation the first time Isikoff tries it out, Capone interjects "must have been, right," Ja637, suggesting that Isikoff is merely providing a possible gloss on Couch's tweets (even though he knows they make no mention of Hillary Clinton at all). If so, Isikoff *knew for a fact* that Couch did *not* say

Capone was conspiring with Hillary Clinton or her aides because Isikoff's only source

for the quotation implicitly denies it. Yet he repeats the quotation *as truth*. As the

FAC puts it:

> Isikoff is quoting his own fabrication. The statement that Joe Capone was
> meeting with aides to Hillary Clinton does not originate with Capone, nor,
> obviously with Matt Couch. It is a pure fabrication by Isikoff.

Ja647.

This is either reckless disregard of the truth or conscious falsehood. Either way

it raises an unavoidable inference of defamation.

In a similar vein, a plausible inference of reckless disregard inference arises

from Isikoff's accusation that Couch has claimed Joe Capone and Mark Mueller were

involved in a "cover up" of the Seth Rich murder. Ja641, Ja116. Isikoff's only source

for the allegation that Capone participated in a cover-up was a cryptic tweet that

cannot fairly be read as an attack on Capone. Ja497. Isikoff twists an oblique comment

into a direct declarative accusation, knowing that his target has not actually made the

comment alleged.

The difference between the oblique comment and the direct accusation is

significant in terms of the reputational effect on Couch, because with the twisting

misquoting of Couch Isikoff can editorialize that Couch is "sickening." Ja643.  Mark

Mueller himself never makes this accusation, even though he makes numerous wild

and false allegations. Isikoff's only other source for Mark Mueller's claims is

Mueller's unnamed ex-girlfriend, who warned Mueller about "fake stuff" on the

Internet. Ja638. Reliance on a single anonymous source making a vague, unsubstantiated allegation raises a clear inference of reckless disregard, combining the pitfalls of "unverified anonymous" communications, "inherent" improbability, and "obvious reasons to doubt." *St. Amant*, 390 U.S. at 733.

Mark Mueller generally raises a distinct set of issues with respect to reckless disregard. As discussed, Mueller has connected trolls "like Matt Couch" with the public disclosure of phone numbers and addresses, the gruesome superimposition of Mueller's head on the body of a mass-murderer, the constant harassing and even apparently illegal attempts to break into his apartment. But for Mueller, the link between the horrible conduct and Matt Couch is tenuous: Couch might be the source or it might be someone like Couch. Appellant had originally named Mueller in his Complaint, but then voluntarily dismissed him from the case. ECF Dkt. 50. Had he maintained his action against Mueller he might have faced challenges in convincing the court that Mueller's comments, by themselves, were "of and concerning" Couch.

But Isikoff's editorial intervention, his conscious structuring of the interview, sear into the listener's mind, in the words of the FAC, Ja639, the relationship between the horrific conduct directed at Mueller and the name Matt Couch. The FAC shows in detail how the editorial process works and how Isikoff juxtaposes his Mueller's "like Matt Couch" with a lengthy and deliberately negative portrait of Couch consciously designed to convince the reader that it is Couch who is the

source of all the collateral damage Isikoff deplores, including specifically the harm to Mueller fresh in the listener's mind.[13] Isikoff's republication of Mueller's assertions is as thinly sourced as one could imagine, relying on second-hand reports of an anonymous former girlfriend warning about "fake stuff." *See supra* at 27. Isikoff knows the assertions about Couch are false: he has done extensive research, reviewed thousands of tweets, submitted what he considers exculpatory evidence from Couch's social media history, and he has not found a single piece of evidence worthy of sharing with his audience that connects Couch with the Mueller accusations. Isikoff nonetheless makes a conscious editorial decision to disregard what he knows in service of the story he wants to tell: Couch is the villain, the "sickening" embodiment of the awful conduct directed at Mueller, Capone and others that causes, as Episode 6 is entitled, horrific "collateral damage." *Conspiracyland* did not spring fully formed out of the mind of an anonymous producer. It was created, shaped, intentionally structured. Isikoff uses a tried-and-true editorial technique to connect his villain with "facts" he wants to attribute to his

---

[13] *See supra* at 20-21. Judge Leon believed that the only relevant additions in the FAC were the insertion of details about the Washington Post story discussed *supra* at 6, and the reports of Seymour Hersh, discussed *infra* at 50-51. This is incorrect. In fact, the FAC provided greater detail to support a finding of reckless disregard, highlighting Isikoff's admission that he had reviewed "thousands" of Seth Rich-related posts, the manner in which Isikoff fabricates a quotation and then quotes his own fabrication as fact, and the editorial choices that, as in this case, stem from a conscious decision to place narrative in front of, and above, truth. The extent of the changes can be seen in the redline Appellant submitted to the District Court. Ja.671 – 762.

villain: juxtaposition.

Deceptive editorial juxtaposition is a well-known and effective technique of defamation in print media. *See* Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 2.4.2, at 2–19 (2004). As the First Circuit has shown, in reversing a district court, suggestive juxtaposition can give rise to defamation where a newspaper published the picture of a high-school girl next to the headline, "The Mating Habits of the Suburban High School Teenager." *Stanton v. Metro Corp.*, 438 F.3d 119, 122 (1st Cir. 2006). Plaintiff alleged that the juxtaposition of her photograph and the text describing suburban teenage promiscuity insinuated that she was engaged in the conduct described in the article. *Stanton*, 438 F. 3d at 123. In carefully examining the "article in its totality in the context in which it was uttered or published and considering[ing] all the words used, not merely a particular phrase or sentence," the court concluded the publication was "reasonably susceptible to a defamatory meaning." *Stanton*, 438 F.3d at 125, 128.

So too, here, at the pleading stage, and considering the additional context provided in the First Amended Complaint, and in particular its stress on the manner in which Isikoff immediately juxtaposes "people like Matt Couch" and Matt Couch himself, directly shining a light on Plaintiff and underscoring an acknowledged mistake with respect to something unrelated, the listener has no doubt whatsoever that it is Couch who is alleged to be harassing and doxing Mueller and linking him

to Jeffrey Dahmer, when, in reality these claims are completely false, which Isikoff knows.[14]

Isikoff's character assassination of Couch – designed to portray him as a "polluter" of discourse and a "sickening" character through false statements, deceptive juxtaposition, fabrication of quotation among other techniques – is of a piece with his instrumental use of specific individuals (such as Capone and Mueller) to create the villain his listeners are intended to both fear and despise. Isikoff knows there is no evidence to support the charge that Couch is "alt-right." *See supra* at 21-22. Yet he endorses and promotes this charge repeatedly, first, through his editorial juxtaposition of the portrait of Couch immediately after Mueller has asserted he is being targeted by "alt-right" "people like Matt Couch"  and then, in his NPR interview by describing the Hillary Clinton assassination theory as one disseminated by the "alt-right" and "far-

---

[14] Isikoff's techniques are more like "conscious disregard" that "reckless disregard." The FAC devotes the space it does to Isikoff's career to show that the unfounded character assassination of Couch in the service of a larger narrative is of a piece with Isikoff's writings over the years, focused on shaping political conduct through politically charged narrative regardless of actual facts, as most strikingly demonstrated in Isikoff's relentless promotion of the false narrative that Trump colluded with the Russian government to win the 2016 election. Ja609-610. Notably, Isikoff laundered the infamous "Steele dossier" into the mainstream press, exhibiting reckless disregard for the truth in seeding into the mainstream press the wild, inherently improbable, allegations in the "dossier" as though they were fact. Ja615-616, Ja617. Isikoff knows that his ability to shape narrative can shape reality. Ja618. Isikoff wields this power irresponsibly, attempting to destroy a candidate for the presidency and the president himself by the promotion of transparent falsehoods, and leaning with all his journalist weight on Couch, presumed too weak to respond effectively.

right," Ja573, including Matt Couch, who is the subject of the fabricated quotation in which he allegedly accuses Joe Capone of conspiring with aides to Hillary Clinton at the White House. *See supra* at 26. Here as elsewhere, the FAC has plausibly pled defamation by implication against Isikoff. *See White v. Fraternal Ord. of Police*, 909 F.2d 512 (D.C. Cir. 1990)(citing *McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 717 F.2d 1460 (D.C.Cir.1983) *Southern Air Transport, Inc. v. American Broadcasting Companies, Inc.*, 877 F.2d 1010 (D.C.Cir.1989) and *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 648 (8th Cir. 1985), *reheard on other grounds*, 788 F.2d 1300 (8th Cir. 1986) , *cert. denied,* 479 U.S. 883 (1986).

Deceptive juxtaposition and superposition are classic techniques of defamation by implication. As this Court stated in *White v. Fraternal Order*:

> *In McBride,* the author's juxtaposition of two classes of expert fees supplied the affirmative evidence rendering it reasonable to impute a defamatory meaning to the publication. If in *Southern Air Transport,* for example, the "South Africa Connection" graphic had been superimposed over the footage of Southern Air's plane, this most likely would have constituted affirmative evidence to justify imputing the defamatory meaning that Southern Air was in partnership with South Africa.

*White*, 909 F.2d at 520.

As with the juxtaposition of Mueller's claims about "people like Matt Couch" and Isikoff's immediate portrait of Matt Couch, the juxtaposition of the claim that the Hillary Clinton conspiracy theory was promoted by the "alt-right" with the fabrication of the Matt Couch conspiracy quotation is designed to convey that Couch is "alt-

right." That the accusation is defamatory and highly injurious to reputation can be seen from the common equating of individuals on the "alt-right" with terrorists posing existential threats to democracy and civil society. Jason J. Sullivan-Halpern, *The Globalization of Hate: Are Domestic Terrorism Laws Sufficient to Quell New Threats from Alt-Right Lone-Wolf Extremists?*, 9 Penn St. J.L. & Int'l Aff. 133, 138 (2020) (exploring alt-right terrorism in the horrific attack committed by supporters of the alt-right in Oslo, London, Christchurch, and El Paso); Ann C. McGinley, *Misogyny and Murder*, 45 Harv. J. L. & Gender 177, 204 (2022) (linking alt-right to domestic and international terrorism). Falsely accusing an individual of being a "terrorist" or having ties to "terrorist organizations" is actionable as defamation.  *Xcentric Ventures, LLC v. Stanley*, No. CV-07-00954-PHX-NVW, 2007 WL 2177216, at *4 (D. Ariz. July 27, 2007); *Sirer v. Aksoy*, No. 21-CV-22280, 2022 WL 10046427, at *1 (S.D. Fla. Oct. 17, 2022).[15]

---

[15] Isikoff himself makes the connection explicit.

> I should add that the FBI now realizes that these kind of fringe conspiracy theories, because of social media, are getting a lot of traction and have officially sort of concluded this is a law enforcement threat, a potential terrorist threat, because people are motivated to act when they hear these things.

Ja581.

As to the charge that Couch is an "Internet troll," the allegation is also clearly false. *See* 22-23. Isikoff's knowledge of the falsity of the charge can be seen in his own unflattering portrait of Couch: nowhere in Isikoff's deliberately tendentious portrait is there the slightest hint that Couch is acting either in the dictionary sense of a member of an online community seeking to disrupt that community or in the Mueller report sense of being a paid operative who posts inflammatory or otherwise disruptive content on social media or other websites. *See supra* at 21.

For all the reasons stated above – Isikoff's conscious use and promotion of obvious falsehoods, his reliance on anonymous sources and other sources whose veracity he has reason to doubt, his distortion and fabrication of quotations, his deceptive editing and juxtaposition – Appellant has more than adequately raised a plausible inference of reckless disregard at the pleading stage and the decision of Judge Leon, both explicitly and implicitly wrongly applying a summary judgment standard on a motion to dismiss, should be reversed.

## V.    <u>THE DOCTRINES OF REASONABLE IMPLICATION, FAIR COMMENT, ABSENCE OF VERIFIABLE FACT, SUBSTANTIAL TRUTH, AND ABSENCE OF DEFAMATORY MEANING DO NOT APPLY.</u>

Without analysis, Judge Leon also holds, in a footnote, that Appellant's defamation claim fails because "the statements underpinning those claims variously (1) cannot be reasonably implied from the podcast; (2) qualify as 'fair comment'; (3)

do not contain a verifiable fact; (4) are substantially true; or (5) cannot be said to actually carry a defamatory meaning." Ja518. Given the absence of analysis, Appellant is left guessing as to which allegations Judge Leon felt were defective for which reason.

A. Reasonable Implication. There is no issue as to the implication of the majority of the statements challenged. Defamation by implication has also been addressed above and need not be repeated here. *See supra* at 29-32. With respect to the Hillary Clinton assassination theory, in the context of the podcast, the allegation that Hillary Clinton was conspiring with someone on the eve of Seth Rich's murder can only fairly be meant to communicate that Hillary Clinton was conspiring to assassinate Seth Rich. This assassination theory is the animating thesis of the entire podcast. Ja625, Ja631, Ja635, Ja637, Ja663, Ja667. No reasonable listener would believe that Hillary Clinton and her aides were simply conspiring with Joe Capone to organize a surprise birthday party at the Lou's Bar and Grill.

B. Absence of Verifiable Fact. Judge Leon's evocation of this concept is puzzling. With respect to Couch's statements, every allegedly defamatory claim can readily be verifiable by reference to Couch's actual tweets, posts, likes, columns and other publications. The concepts of "Internet troll" or "alt-right" are sufficiently determinate that the trier of fact can easily verify whether Couch does or does not come within these concepts.

C. <u>Fair Comment.</u> Judge Leon's evocation of this doctrine is misplaced.

Isikoff's repetition of Capone's false comment that Couch stated Capone was meeting with Hillary Clinton at the White House is not a "comment" on anything; it is simply false. Isikoff's fabricated quotation that Couch claimed Capone was conspiring with Hillary Clinton or her aides cannot benefit from the doctrine for two reasons. First, a conclusion based on a misstatement of fact is not protected by the privilege. *Jankovic v. Int'l Crisis Grp.*, <u>593 F.3d 22, 29</u> (D.C. Ci<u>r. 2010</u>). *See also Washington Times Co. v. Bonner,* <u>86 F.2d 836, 841</u> n. 4 (D.C.Ci<u>r.1936</u>) ( "[T]he facts asserted as predicate of the fair comment must be true....").

In the Issikof/Capone exchange, what is presented as the factual predicate of the alleged statement that Hillary Clinton was conspiring with Joe Capone is that Couch alleged Joe Capone had secret meetings with Hillary Cinton.

> *What was Matt Couch saying was the significance of the fact that you had been to the White House on July 6?*
> Capone: *That there were secret meetings going on.*
> Isikoff: *Secret meetings with who?*
> Capone: *Hillary. . . You know . .*

Ja636

But it is false to claim that Couch had alleged there were "secret meetings" with "Hillary," as Couch maintains and Isikoff's own filings demonstrate. Ja478-Ja507. Couch never mentions "Hillary." *See supra* at 16. Thus, fair comment cannot rescue the "conspiring" comment.  Second, when Isikoff repeats his fabrication during the

NPR interview, he is not claiming *to comment* on an alleged statement. He is presenting Couch's alleged statement *as fact*.[16] Fair comment is of no help.

With respect to Isikoff's technique of defamation by implication using suggestive juxtaposition, fair comment is not relevant. Nor is it applicable to the charge that Couch claimed Mueller participated in a cover-up. This statement is presented as factually true and nothing suggests it is a gloss on something Mueller or Couch said. As to the claim that Couch asserted that Capone specifically was involved in a cover-up, it stretches the doctrine of fair comment past the point of plausibility to infer a specific accusation against a specific individual from a general statement that there is "so much cover-up"—a statement whose precise meaning is virtually impossible to derive, but that Isikoff converts into a black and white declarative sentence. A specific charge of criminal conduct – Capone and Mueller were part of cover-up, Ja641, Ja116 – is not "comment" let alone "fair" comment. *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 66 (2d Cir. 1980) (underscoring problem of extending privilege of fair comment to include specific allegations of fact). P. Keeton, *Defamation and Freedom of the Press*, 54 Tex.L.Rev. 1221, 1254 (1976) ( "(a)ny charge of specific misconduct or defamatory fact should be treated as a statement of fact regardless of whether the publisher conveys his deductive opinion alone or with

---

[16] As discussed above, because Capone has already pushed back on the quotation, Isikoff knows it is not true. *See supra* at 17, 26. Yet he unquestionably presents it as such. This is reckless, indeed conscious, disregard of the truth.

the information to support it."). Where the alleged charge is itself claimed to be false, fair comment does not apply. *Milkovich v. Lorain J. Co.*, <u>497 U.S. 1, 13</u>–14 (1990) (fair comment only affords "legal immunity for the honest expression of opinion on matters of legitimate public interest *when based upon a true or privileged statement of fact.*") (emphasis added).

      D.  <u>Substantial Truth</u>. None of the Capone-related statements can be "substantially true" since they are all based on a falsehood that Couch said anything about Hillary Clinton. Further, a pure fabrication cannot benefit from substantial truth. The Mueller related statements are all alleged to be categorically true; their repetition and attribution to Couch could only be saved by evidence – that does not exist – that Couch actually made the statements. With respect to the cover-up comments, Isikoff offers no underlying Mueller statement as to which Couch's alleged statement could be "substantially true." With respect to the Capone cover-up comment, "substantial truth" is designed to protect "small changes" in meaning, not the creation of a specific charge of criminality out of a general comment of uncertain application. *See* Restatement (Second) of Torts § 581A, comment f (1977) ("slight inaccuracies of expression are immaterial").

      With respect to Couch's general allegation that it is defamatory to state or imply that he has promoted the Hillary Clinton assassination theory, the substantial truth

doctrine does not protect Isikoff. First, the statement is flatly false.[17] Second, no reasonable person would claim that is substantially the same thing to make vague insinuations about a meeting at the Obama White House and to state that Hillary Clinton specifically was conspiring to assassinate Seth Rich. This is not like slight inaccuracies in the description of corporate structure that do not give rise to defamation liability. *See Liberty Lobby,* 838 F.2d at 1296.

Under the established guidance of this Court, the key question is whether the "sting of the charge" is "substantially true"? *Id.* Here the "sting" of the charge is that Couch has stated or insinuated that Hillary Clinton was involved in the assassination of Seth Rich. But there is absolutely nothing in the "evidence" Isikoff has put in the record to establish that this "sting" supports in any way the claim or implication that Couch is a promoter of the Hillary Clinton assassination theory or even that he ever spoke about or connected Hillary Clinton to the Seth Rich murder in any way. Similarly, comments about meeting with Hillary or conspiring with Hillary cannot convey the "sting" of a charge because Couch never mentioned Hillary Clinton or her aides and Isikoff provides nothing other than Couch's tweets that prove the opposite. The issue with the Mueller comments is not the "sting" of the charges, but whether Isikoff can get away with his technique of defamation by implication and juxtaposition. *See supra* 29-32.

---

[17] *See supra* at 16-17.

E.  Incapable of Defamatory Meaning. Had Judge Leon elaborated on this argument, its flaws would have been readily apparent. Linking Couch to the Hillary Clinton assassination theory that is presented as the handiwork of a nuclear adversary of the United States, elsewhere alleged to have interfered in the 2016 election, profoundly harms Couch's reputation, and presents him as, in effect, a traitor to his country, knowingly or unknowingly spreading Russian propaganda, "polluting" political discourse with disinformation and lies, even being a "terrorist" for promoting "far-right" fringe conspiracies. Ja581. Whether this defamatory meaning is gleaned from references to secret meetings with Hillary Clinton or from the fully formed fabrication Isikoff disseminates during the NPR interview, it is hard to imagine a more harmful attack on the publisher of the DC Patriot website and a social commentator with a wide following. Ja611. Isikoff himself characterizes Couch's methods – which he has falsely portrayed by defamatory juxtaposition – as "sickening," a charge that is intended to go to the heart of Couch's standing in the community. In addition, for an independent investigator, the charge of false accusations of cover-ups clearly undermines the person's professional standing. Finally, falsely presenting Couch as an Internet troll and member of the alt-right damages Couch's reputation as a serious independent investigator and legitimate social media influencer, while painting him as a white supremacist terrorist and thus a despicable criminal. Defamatory meaning and intent fairly ooze from nearly every minute of Episode 6 of *Conspiracyland*.

40

## VI. THE DISTRICT COURT WRONGLY DISMISSED COUCH'S REMAINING CLAIMS AGAINST ISIKOFF AND VERIZON.

Judge Leon's dismissal of Couch's remaining claims against Yahoo and Verizon and his refusal to allow Couch to proceed to file an amended complaint with respect to these claims were predicated on Couch's alleged failure to "show" reckless disregard "with clear and convincing evidence." Leaving aside Judge Leon's improper use of a summary judgment standard, to the extent Couch has, in fact, properly plead falsity and reckless disregard, these "dependent" torts survive and Judge Leon erred in dismissing them.

On intentional interference with business relations, Judge Leon erred as a matter of law. This tort is *not* inherently tied to or duplicative of defamation, and Judge Leon should be reversed for so holding. *See Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017).  Couch has an existing commercial relationship with those who provide crowdfunding for his investigation. Ja633. Isikoff's language and the context leave no doubt that he is trying to interfere with Couch's use of crowdfunding. *Id.* His disparaging rhetoric and insinuations of improper behavior are alleged to have harmed Couch's ability to use crowdfunding. Ja656-57. This is sufficient to state a claim for intentional interference with business relations. Similarly, Couch has an existing business that involves the sale of merchandise, including America First T-shirts. Ja633. Isikoff directly interfered with the business

41

by implying that selling such T-shirst and raising funds was improper. *Id.* Isikoff's

attacks are alleged to have damaged Appellant's business. Ja657. Again, this is

sufficient to state a claim for intentional interference with business relations,

regardless of whether a claim for defamation lies. *See, e.g.*, *Bankwest v. Fid. &*

*Deposit Co. of Maryland*, 63 F.3d 974, 981 (10th Cir. 1995) (citing *Restatement*

*(Second) of Torts* § 623A)[18]; *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766

(Tex.1987) (contrasting action for defamation with action for injurious falsehood and

noting that "[t]he action for defamation is to protect the personal reputation of the

injured party, whereas the action for injurious falsehood or business disparagement is

to protect the economic interests of the injured party against pecuniary loss").

## VII. YAHOO, VERIZON, AND APOLLO ARE LIABLE FOR ISIKOFF'S DEFAMATION OF COUCH.

In addition to claiming liability for Isikoff, the FAC asserts that Verizon,

Yahoo! and Apollo Global Management, Inc. ("Apollo") are also liable as publishers

---

[18] The Restatement takes no position on "(1) whether, instead of showing the publisher's knowledge or reckless disregard of the falsity of the statement, as indicated in Clause (b), the other may recover by showing that the publisher had either (a) a motive of ill will toward him, or (b) an intent to interfere in an unprivileged manner with his interests; or (2) whether either of these alternate bases, if not alone sufficient, would be made sufficient by being combined with a showing of negligence regarding the truth or falsity of the statement." Either (1) or (2) appears to state D.C. law correctly. *Whitt*, 157 A.3d at 202-04.

or re-publishers of the defamatory statements made on the Yahoo! News *Conspiracyland* podcast. Ja651-52. The precise contours of corporate liability require discovery. Yahoo! News was at one time a division Yahoo! Inc., which would have made Yahoo! Inc. the publisher of the *Conspiracyland* podcast. However, Verizon created a separate vehicle, initially known as Oath, Inc. ("Oath"), to hold the assets of Yahoo Inc., and AOL acquired by Verizon. Ja611-12. Verizon subsequently rebranded Oath as Verizon Media, and then sold Verizon Media to an affiliate of Apollo (the "Apollo Affiliate"). *Id.* The Apollo Affiliate has rebranded Yahoo! Inc. as "Yahoo." Ja612.  It is unclear whether Yahoo is a division of the Apollo Affiliate or a free-standing company. Verizon has retained a 10% interest in the Apollo Affiliate. *Id.* Thus the extent of publisher liability of Yahoo, the Apollo Affiliate and Verizon is unclear. Plaintiff requested initial discovery so that the proper parties could be served, but his request was denied without explanation. Ja028.[19]

In addition, independently of direct liability as a publisher, Plaintiff alleged that Verizon was liable for aiding and abetting the publication of the *Conspiracyland* podcast, encouraging Verizon Media to produce salacious and sensationalist content that would improve revenues at its media subsidiary. Ja660-62.  On reversal and remand, Judge Leon should be ordered to permit limited initial discovery to ensure that Plaintiff pursues the appropriate parties.

---

[19] The Final Order omits any mention of Plaintiff's discovery request. Ja029.

## VIII.   NPR IS LIABLE FOR AIDING AND ABETTING DEFAMATION AND CONSPIRACY TO DEFAME.

In the First Opinion, Judge Leon dismissed all claims of aiding and abetting and conspiracy because, according to Judge Leon, Appellant failed to allege an "underlying" tort. Ja519-20. Judge Leon adopts this same reasoning in the Second Opinion, both as to the Motion for Leave to Amend and the Motion for Judgment on the Pleadings. Ja024, Ja027. Judge Leon was wrong on both counts.

As discussed above, Isikoff used the NPR broadcast to continue his defamation of Couch and, in fact, took his defamation a step further by quoting his own conspiracy fabrication as the truth of what Couch had reportedly stated about Joe Capone and Hillary Clinton. *See supra* at 17, 26, 36-37. As a result, NPR faces liability for aiding and abetting Isikoff's defamation and conspiring with him to commit the defamation. Aiding and abetting liability on the part of NPR does not require a showing of actual malice on the part of NPR. Rather,

> Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)

The FAC plausibly alleges that Dave Davies, an established reporter at NPR, a reputable national media organization, had listened to the *Conspiracyland* podcast and was generally aware that Isikoff would attack Matt Couch on the show. Ja646. The

44

NPR interviewer repeatedly tosses Isikoff softballs showing his familiarity with the podcast generally and the portions specifically directed at Matt Couch, when he focuses on a bartender and neighbor who get "slimed on the Internet." Ja646. Davies' line of questioning provides substantial assistance to Isikoff in repeating and elaborating on his attacks on Couch, which become even further divorced from reality when Isikoff quotes his own fabrication as fact, specifically linking Couch with a Hillary Clinton conspiracy. *See supra* at 17, 26, 36-37. The FAC plausibly alleges, by showing in detail the level of coordination implied in the Davies questioning, Ja657-659 that:

> Isikoff and Davies conferred in advance of the NPR Interview, discussed the *Conspiracyland* podcast, agreed on the questions that would enable Isikoff to repeat his *Conspiracyland* talking points and effectively smear Matt Couch and the Internet horde. Davies and NPR agreed to permit Isikoff to make unsupported claims about Couch and to tarnish his reputation without evidence. Ja659.

Thus, Davies was generally aware that Isikoff intended to falsely smear a third party without evidence. As a fellow journalist, Davies knew or should have known that disseminating false smears of a third party was tortious, and yet he participated in lending the prestige and reach of the NPR platform to an evidence-free attack on Couch. Ja662-63. Moreover, because he had reviewed the *Conspiracyland* podcast before the interview, Davies knew that Isikoff's quotation of Couch's alleged statement relating to Hillary Clinton or her aides conspiring with Capone was false, yet he assisted Isikoff in making this false statement nonetheless.

Similarly, the FAC plausibly alleges a civil conspiracy between Isikoff and NPR's Dave Davies. The elements of civil conspiracy consist of: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 101 (D.D.C. 2017). It would have been impossible for NPR to have conducted the Isikoff interview without an agreement as to its scope and coordination on the questions being asked. Ja659. As with aiding and abetting, the conspiracy necessarily included an agreement that Davies would permit Isikoff to develop his thesis on Couch without being contradicted, as a debate on that topic would have diverted time from other topics Davies and Isikoff wanted to cover. For purposes of the agreement to participate in unlawful conduct, this prong of the conspiracy analysis could be proven by Davies' conscious avoidance or deliberate ignorance of the truth. Ja659. *Cf. United States v. Alston-Graves*, 435 F.3d 331, 338 (D.C. Cir. 2006) ("deliberate ignorance" or "conscious avoidance" instructions are commonly given and commonly upheld). Davies' overt acts in furtherance of the conspiracy consisted of his targeted questions that permitted Isikoff to make his defamatory statements, including his presentation of a Hillary Clinton conspiracy quotation both he and Isikoff knew to be false. *See supra* at 17, 26, 36-37. Couch suffered independent harm from the

defamation on the NPR broadcast since NPR has a different audience and different national reach than Yahoo. Fresh Air, the program on which Isikoff appeared, has a national audience with 6 million weekly listeners. Ja665. The FAC therefore plausibly states a claim of conspiracy to defame against NPR.

## IX.    NPR IS LIABLE FOR NEGLIGENT SUPERVISION OF DAVE DAVIES.

Under D.C. law, "to establish a cause of action for negligent supervision, a plaintiff must show that the employer knew of or should have known its employee behaved *in a dangerous or otherwise incompetent manner*, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937–38 (D.C. 2002) (emphasis added). Plaintiff has pled facts to satisfy this test as to both NPR and Yahoo.

The regular producer of the Fresh Air broadcast is the journalist Terry Gross, a senior agent of NPR. Ja664. Fresh Air is a nationally syndicated radio show, and one of NPR's flagship broadcasts, with approximately 6 million weekly listeners. Ja665. Ms. Gross knew that Dave Davies planned on filling in for her and knew or should have known that he planned on providing Isikoff with a platform to promote his *Conspiracyland* ideas. Ja668. Dave Davies, who reviewed the *Conspiracyland* podcast in advance, as he admits, Ja646, Ja658, knew that a focus would be on third parties who were accused of "sliming" others and could be attacked as treasonous

purveyors of Russian propaganda and "terrorists." Ja 578, Ja581. It was reasonably foreseeable that an individual attacked, explicitly or implicitly, as promoting a Russian conspiracy theory, "sliming" others, and acting as a potential "terrorist," would himself be placed at great risk from outraged listeners. The foreseeability of the harm, which materialized when Couch received death threats in the wake of the broadcasts and his family and children were attacked, Ja655, created a common law duty of care on the part of NPR to supervise its employees involved in creating, endorsing or promoting harmful discourse. *Phelan* 805 A.2d at 937–38. NPR breached this duty by failing to prevent evidence-free attacks on Couch or, at a minimum, by failing to insist on a disclaimer or warning as to the discredited nature of Isikoff's theories and the unproven allegations that would be made about third parties.[20]

## X.  NPR IS LIABLE FOR REPUBLISHING ISSIKOF'S DEFAMATORY STATEMENTS.

At common law, the re-publisher of a defamatory statement made by another is itself liable for defamation. *Brennan v. Kadner*, 351 Ill. App. 3d 963, 970, 814 N.E.2d 951, 959 (2004).  However, following the Supreme Court's decision in *New York*

---

[20] Admittedly, DC tort law bumps against the First Amendment, but there is no necessary conflict between the right to free speech and an employer's duty to supervise reporters engaged in high-wire "activist" journalism to make sure any harm to third parties is minimized through editorial control, rigorous fact-checking, and insistence on caveats and qualifications when third parties are attacked.

*Times v. Sullivan*, 376 U.S.254 (1964) this Court has held that the republisher of an allegedly defamatory statement can be held liable only if it republished the statement with actual malice. *Waskow v. Associated Press*, 462 F.2d 1173, 1176 (D.C. Cir. 1972). Such reckless disregard could be shown if the information was transmitted to the re-publisher in a manner that was "likely to arouse suspicion" or the re-publisher had "cause to doubt" the story. *Id.*

Here, Michael Issikof appeared on NPR's Fresh Air broadcast intending to promote his Russian conspiracy theories despite the Washington Post having debunked Issikof's central thesis as to the Russian military intelligence origins of the Hillary Clinton assassination theory. Ja671. It is a reasonable inference that a seasoned journalist working on an award-winning nationally syndicated radio show would have read or been familiar with a story in the DC paper of record directly addressing and explicitly debunking one of Issikof's central theses. At a minimum, the Post story was "likely to arouse suspicion" and "cast doubt" on Issikof's yarn. Yet Davies consciously chose to disregard evidence that undermined Issikof's veracity and credibility. Instead, David Davies used friendly, leading question to assist Isikoff in repeating the main themes of the Conspirayland podcast without facing any challenge or fact-check. Ja658-59. Likewise, Terry Gross can be heard further promoting the Russian military intelligence story, Ja656-57, completely ignoring the reporting of the Washington Post, which had unambiguously dismantled Isikoff's core thesis:

> The Russian rumor [writes Isikoff] is "the first known instance of Rich's murder being publicly linked to a political conspiracy." In the podcast, "*Conspiracyland,*" Isikoff makes a similar claim. *But that's not true.*

Ja672.

There is an even more reckless disregard for the truth that permeates the NPR interview. As the FAC discusses in detail, the idea that there may have been a connection between Seth Rich and Wikileaks was supported by Pulitzer-Prize winning investigative journalist Seymour Hersh, in a recording that appeared on the Internet in 2017. Ja621. In the recording, Hersh states that a well-placed source read to him from an FBI report confirming that Seth Rich had transmitted emails to Wikileaks and requested payment in return.  Ja610, Ja621. Couch has also supported the Hersh reporting. Ja610. Yet Isikoff consciously disregards even the existence of the Hersh audio, demonstrating a reckless disregard for the truth. Dave Davies gives Isikoff an opportunity to discuss the Hersh report, Ja658, but Isikoff issues a flat denial that there is any support for the notion that Seth Rich was involved in transmitting emails to Wikileaks. Ja577. Davies and NPR make a deliberate choice to exclude any mention or questioning of the Hersh report. Ja667. Because of Isikoff's promotion of a debunked conspiracy theory and his patently false denial that there was any support for the Seth Rich/Wikileaks allegation, Dave Davies had "cause to doubt" Isikoff's reliability and unsupported allegations would reasonably "arouse suspicion." *Waskow,* 462 F.2d at 1176.

When Isikoff fabricates the statement from Couch that Joe Capone had visited the White House to meet with aides to Hillary Clinton, Davies should immediately have requested clarification or evidence. Davies *knows* the statement is false. He *knows***,** having listened to the *Conspiracyland* podcast in detail, and having prepared questions specifically relating to the alleged "sliming" of Capone and Mueller, that Capone distances himself from the alleged quotation, saying "must have been, right?" Ja637. Davies knows, in other words, that Isikoff's only source for the quotation does not endorse it as literally true. And yet, in the NPR interview, Capone's skeptical "must have been" is transformed into a *direct statement made by Couch*, which Davies *knows* to be false based on his knowledge of Isikoff's own reporting. Davies recklessly ignores what he knows to be true – that Couch did not make the alleged statement – and lets Isikoff repeat a lie that has caused Couch severe medical, emotional, professional, and familial harm. *See* Ja611, Ja642, Ja655.

Davies knows that Isikoff has been dishonest on the most important aspects of his entire theory; he knows the Russian origin of the Hillary Clinton assassination theory has been debunked; he knows the Sy Hersh recording exists but allows Isikoff to ignore it; and he knows Isikoff is lying about Couch and lets him do it anyway. Davies thus foregrounds the question Isikoff himself had posed and which they both must now be made to answer: "What recourse do people have when clear fabrications, clear distortions are posted on the Internet [and broadcast on the radio]"? Ja580.

51

## CONCLUSION

For the reasons set forth above, the decision of Judge Leon denying Appellant leave to amend his complaint, granting NPR's motion for judgment on the pleadings, and dismissing the case with prejudice must be reversed and plaintiff must be permitted to file an amended complaint and proceed to discovery.

January 31, 2023

Respectfully submitted,

By *Den Quainton*

Eden P. Quainton
QUAINTON LAW PLLC
2 Park Ave., 20th Fl,
New York, NY 10016
Telephone: (212) 419-0575
Fax: (212) 376-5699
E-mail: eden.quainton@quaintonlaw.net
*Attorneys for Plaintiff Matthew Couch*

MATTHEW COUCH,

APPELLANT


*v.*


VERIZON COMMUNICATIONS, INC.

MICHAEL ISIKOFF,

APPOLLO GLOBAL MANAGEMENT INC.,

NATIONAL PUBLIC RADIO,

RESPONDENTS

---

*ON APPEAL FROM A FINAL ORDER FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA*

---

**CERTIFICATE OF CONFORMITY**

---

## CERTIFICATE OF CONFORMITY

I, Eden P. Quainton, an attorney duly admitted to practice before this Court, hereby certify Appellant's Brief contains 12,969 words, in compliance with Circuit Rule 32(a)(7)(B) of United States Circuit Court of Appeals for the District of Columbia. In preparing this certification, I have relied on the word count of the word-processing system used to prepare Appellant's Brief.

This brief complies with the word count limitations of Fed. R. App. P. 32(a)(7)(B)(ii), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

The brief complies with the requirements of Fed. R. App. P.32(a)(5) and (6) and the corresponding Circuit Rules of United States Circuit Court of Appeals for the District of Columbia because it was prepared in a proportionally spaced 14-point Times New Roman typeface font using Microsoft Word.

Dated:  January 31, 2023

By *Eden Quainton*
Eden P. Quainton
QUAINTON LAW PLLC
2 Park Ave., 20th Fl,
New York, NY 10016
Telephone: (212) 419-0575
Fax: (212) 376-5699
E-mail: eden.quainton@quaintonlaw.net
*Attorneys for Plaintiff Matthew Couch*

No. 22-7114

---

---

## *In the United States Court of Appeals for the District of Columbia Circuit*

MATTHEW COUCH,

APPELLANT

*v.*

VERIZON COMMUNICATIONS, INC.

MICHAEL ISIKOFF,

APPOLLO GLOBAL MANAGEMENT INC.,

NATIONAL PUBLIC RADIO,

RESPONDENTS

---

*ON APPEAL FROM A FINAL ORDER FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA*

---

## CERTIFICATE OF SERVICE

---

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on January 31, 2023, the foregoing document was filed through the CM/ECF system and thereby served electronically on counsel for National Public Radio, Inc., Michael Isikoff, and Verizon Communications, Inc.

Dated: January 31, 2023

By _Eden Quainton_

Eden P. Quainton
QUAINTON LAW PLLC
2 Park Ave., 20th Fl,
New York, NY 10016
Telephone: (212) 419-0575
Fax: (212) 376-5699
E-mail: eden.quainton@quaintonlaw.net
*Attorneys for Plaintiff Matthew Couch*